Our fifth case this morning is Deppe v. the NCAA, Case 17-1711. May it please the court, my name is Elizabeth Fagan and I represent the plaintiff appellant in this matter. We are seeking reversal of Count 2 of Plaintiff's Complaint, which alleged a Section 1 antitrust violation against the NCAA, based on the NCAA's bylaw, what we call the Year in Residence Bylaw, requiring Division 1 football players to sit out a year if they seek to transfer schools. Is Mr. Deppe's goal a free agency for college athletes? Is that what his goal in this is? It is not, Your Honor. It is really more narrow than that, to allow the not revenue athletes, so the athletes in revenue sports, such as Division 1 football and basketball, to basically have the same rights as athletes in non-revenue sports, and not to have extra restrictions placed on them in order to protect the economic motivations of the colleges. So in this particular example, and when you talk about free agency, non-revenue athletes, such as track athletes, get a one-time exemption from the Year in Residence Bylaw, but those in the schools that are the richest and have money to protect, so to speak, from their football programs or basketball programs, are restricted from transferring without getting a waiver from the NCAA, which the NCAA does not regularly grant, and actually rarely grants. So for example, with respect to the Year in Residence Bylaw, the question that this Court posed in Agnew are whether bylaws are inherently or obviously necessary for the preservation of amateurism, the student-athlete, or the general product of college football. And we believe that in the first instance, the Year in Residence Bylaw does not fit within that eligibility category. And in fact, here, the District Court did not look at all the allegations of the complaint. The District Court took into consideration two facts, one, that the Year in Residence Bylaw is listed in a section of the NCAA's manual entitled eligibility, and two, that the NCAA used the word eligibility in the bylaw itself. The District Court thus gave the NCAA a giant free pass to unilaterally characterize any of its bylaws as eligibility merely by using the word. And that free pass was not what the Supreme Court envisioned in Board of Regents or what this Court envisioned in Agnew. Well, this clearly is an eligibility rule. Whatever it's denominated, that's what it is. It makes the player ineligible for a year after a transfer. Well, I think when we look at the word eligibility and its use, conceivably the entire, all of the NCAA rules could be entitled. Let's talk about just this one, okay? This is an eligibility rule. It says you are ineligible for one year after a transfer. How is that not an eligibility rule? It has to be. Even if this Court deems that it is an eligibility rule, that does not make it presumptively pro-competitive, that removes the rule from the rule of reason analysis. Oh, but it triggers a presumption under Agnew that it is pro-competition rather than anti-competition. And you know, as Judge Sykes has mentioned, beyond how the rule is labeled, it is logically and literally an eligibility rule in that it determines whether and when a particular category of student athlete is eligible to play. However, in Agnew, this Court also said that that pro-competitive presumption does not automatically make it lawful. In fact, this Court went on to say that the question is whether that rule, whether it's a tradition that might otherwise die. That tradition here is not implicated by this year-in-residence bylaw. For example, it does not implicate whether a student must attend class, whether a student must maintain a certain number of hours, which would go to the academic purposes of a student athlete. It does not implicate whether or not the student athlete can enter a professional draft, whether it can receive, he can receive compensation beyond the cost of attendance. Those are the types of rules. And in fact, the Ninth Circuit recently went through a fairly lengthy history of the types of rules that the NCAA has traditionally implemented that do, in fact, go to this issue of whether it's preserving the product, so to speak, of college football. It's an anti-poaching rule. Well, that says, it seems to me, that NCAA rules which amount to eligibility rules are presumptively pro-competitive, and so that would not amount to an unlawful restraint on trade. And the question— And you're— I apologize. I didn't mean to interrupt. No, no. I apologize. Go ahead. I think the issue there is even if we apply a presumption of pro-competitiveness, it does not make the rule patently lawful. And in fact, in Board of Regents, the Supreme Court said in Note 23 that even good intentions does not make, by the NCAA, does not make a rule patently lawful. And in fact, Board of Regents, Agnew, and American Needle all say that this twinkling of an eye approach, this pro-competitive presumption approach, is actually an application of the rule of reason. And the rule of reason has a third component, and that component is, are there less restrictive ways to implement a rule that perhaps does address your honor's concern about free agency or anti-poaching? And in fact, that's why, and I think that the exceptions to the rule illustrate that there are less restrictive ways. We've alleged that, for example, the non-revenue sports are not subject to this, that Division 1 football players and FBS, which is the Division 1A, so to speak, of football, can transfer to Division 2. There are exceptions to the rule. The only folks that are restricted from moving are those that want to transfer within Division 1 FBS. So you're actually asking us to retreat from the strong presumption that Agnew laid down. I think that this- Or extrapolated from the Supreme Court's case. In Agnew, the court's analysis there of Board of Regents was dicta. And actually, what this court did was back away within Agnew after it discusses Board of Regents. When it discusses the context in which the pro-competitive presumption is seen. And this court then said that a test should be applied, and whether or not that bylaw is in fact, in the twinkling of an eye, preserving the status of an amateur and preserving academic integration. Well, that additional analysis was because the court was not dealing with an eligibility rule. Absolutely, your honor. I agree. If this is an eligibility rule, the strong presumption applies. It does. But where we have alleged that there are less restrictive alternatives, and where NCAA itself has implemented less restrictive alternatives for athletes and non-revenue sports, that it was not sufficient. I keep wondering how that could be here, because it seems to me that by fending off the extreme of free agency, which would permit student athletes to transfer whenever, and as often as they wanted, with no constraint on their ability to play. You know, because of that, the rule tends to preserve the nature of college athletics as amateur and student-oriented athletics. So you know, college athletics are retaining at least some semblance of being about education and amateur competition, rather than some sort of warm-up for professional play for pay. That's right, your honor. And certainly that's the patina that we would all like to place on NCAA sports. But the economic realities, as we've alleged, and have been recognized by the dissent in and by the concurrence most recently in Berger, the economic realities of revenue-producing sports means that we can't just give the NCAA a free pass. And if we don't follow through with the rule of reason analysis, which does have a third step, and allows plaintiff to rebut a presumption of pro-competitiveness with less restrictive alternatives, then in fact the NCAA will have a free pass just by putting a rule, or naming it an eligibility rule. Therefore we think that here we're not necessarily asking for, nor has the NCAA said, that this is a free, you know, to combat free agency in particular circumstances. Whether the way, in fact, what we've alleged is that the way it's been applied is to protect only those Division I sports that are generating the most money and for the most powerful teams in the league. And if so, if you look at the exceptions, there are less restrictive alternatives to address your honors point and concern about free agency. The district court did not get to the additional arguments that the NCAA made. If your honors would like me to get to the additional points that the court could consider on a de novo review, and those are plaintiff has alleged injury to competition, plaintiff has alleged and the Sherman Act does apply to all NCAA bylaws, and I think that that's a fairly uncontroversial point from the court's analysis in Agnew. And finally, a plaintiff does have antitrust standing by virtue of the fact that he is a current student athlete who has been prevented from transferring and continuing to play football. I'll reserve the remainder of my time for rebuttal. Thank you. Thank you. Thank you. Mr. Kirtner. Good morning. May it please the court. My name is Greg Kirtner. I represent the National Collegiate Athletic Association. I'd like to start, if I may, with what seem to me to be a couple of practical questions. And one is the question, who can play in a particular sporting contest of an intercollegiate nature? The rule in question, the bylaw in question, answers that question. It lets us know who can be a punter on Saturday and who can't. And yes, there might be more punters or there might be more running backs if you could play with a 1.8 instead of a 2.1, great point average, but that does not raise an antitrust question. There's an implication of that rather simple question that I just posed, and that is for everybody who, every person who can play, every young man or young woman in intercollegiate sports, there's necessarily somebody else who can't kick on Saturday who might want to. There's a lot of people who play high school sports who don't get to play college sports. There's a lot of people who play college sports, 99 percent of them in fact, who don't get to go on to play professional sports. The second kind of practical question I would like to pose is who should decide these questions? And I think that's really the legal question and the policy question presented to this court, and which has largely previously been answered on really identical circumstances, and that is... Well, I agree with that. Would you also think about whether or not we are an outlier in according eligibility rules of pro-competitive presumption? Because the Ninth Circuit's opinion in O'Banion certainly seemed to suggest that we are. Thank you for that question. I would say that this court is squarely in the mainstream, both with Agnew and Byers, its two prior opinions. Its more recent opinion involving a different issue in Baxter. And the Third Circuit reached the same outcome that I'm urging and that the lower court reached in the Smith versus NCAA case where they found an eligibility rule involving transfer whether graduate students could play at a different school than their original school. They said that's an eligibility rule and that it was reasonable per se as a matter of law. That's squarely the same as the outcome we're seeking here. And the Fifth Circuit reached the same result in a case involving pay for players that made them ineligible. O'Banion, out of the Ninth Circuit, involves a different set of rules, more of the kind that this court found were different in Agnew. Rules of law or rules of fact? I'm sorry, Your Honor? Rules of law. Ninth Circuit follows a different... The Ninth Circuit looked at NCAA bylaws, rules is what I mean, and they were rules as found by the district court there that dealt with whether players could or should be paid for the use of their name, image, and likeness. A different issue. Sorry? A different issue. Yes, sir. It's clearly a different issue. A different issue here. Now, these same plaintiffs in Agnew, in fact, same counsel, because I was here as well, argued that the rules in McCormick, Smith, and Byers were eligibility rules. And in fact, the Agnew opinion says at 342, plaintiffs argue that the presumption should be limited to eligibility rules. That was what the same counsel argued to this court, and that they were eligibility rules, and in drawing a distinction, the rules at issue there, and they tried to limit the presumption, and in fact, for the court, Judge Flom did limit the presumption, but he clearly said that it exists, and he clearly said that it applies to eligibility rules, as is consistent with the Third and the Fifth Circuit. So Third, Fifth, and Seventh Circuits are unanimous on the eligibility issue. Instead, the plaintiffs here, appellants here, seek to craft a different rule. They seek to take some language out of context and extract it from the opinion in Agnew to in effect reverse Agnew and reverse the presumption that would do away with the rule announced there and would do away with the policy underlying that rule that has led the Supreme Court to say that these kinds of rules can be validated in the twinkling of an eye. And the Supreme Court said that not only once in Board of Regents, but went out of its way to say that again, Justice Stevens, in his really swan song on the court, on antitrust issues, said so again, that they can be used and applied in the twinkling of an eye. That just means at the motion to dismiss stage? I think that's what that means. This is a very interesting question. Fortunately, you don't have to answer it here. Well, that's how we interpreted it in Agnew. Yes, absolutely true. And that's certainly how the Third Circuit interpreted it in Smith and the Fifth Circuit in McCormick. And so I think that's what that means. One might ask whether the presumption is rebuttable under any circumstances. And my answer to that is we don't have that before us today. And there might be some. Now, Ms. Fagan argued just a little bit ago, and this kind of was a new argument, that the less restrictive alternative prong of the rule of reason provides a way out of this presumption. And I want to say that that's a clear mistake of law. That's just not correct. You do not reach the less restrictive alternative branch of the rule of reason unless the plaintiff has successfully gotten through the first two or two and a half steps. And that's defined a unreasonable restraint of trade in a properly defined market that has adverse effects on competition and not just competitors, and that the balance of harm clearly tips in favor of the restraint and against whatever pro-competitive justifications are offered. We don't need to reach any of those questions here. And you would only reach the less restrictive alternative if you had gotten through all those questions. This presumption helps answer the question of who should decide. Do we want the antitrust courts making decisions about who should play on Saturday, or do we want educators at the schools? The NCAA is run by its members. It's a membership-led organization. They have committees. They study these things. And the fact that they have some other rules that are a little more liberal than the rules for football means that people have decided rationally they could decide that some sports need the problem solved and some sports do not. In fact, the rule that was at issue in Smith that prohibited graduate transfers has been relaxed since then somewhat, but things change over time. And that is something to be welcomed and celebrated and a basis for applying this presumption because the rules can change over time as circumstances change, as people change, as the student-athletes change, as the schools change. And so these rules are very complicated and they interact with other rules. And the antitrust courts are not well-suited for dealing with them. And the concept of less restrictive alternative doesn't get us there. Is it your position that the pro-competitive presumption accorded to eligibility rules is irrebuttable, which is how Judge Pratt seemed to treat them? And if so, what is the support for that? I think it was treated as not rebuttable by this court in Agnew. I think it was treated as conclusive by the Third Circuit in Smith and by the Fifth Circuit in McCormick. I think that's what the Supreme Court meant when it used twinkling of an eye on two different occasions. But again, I don't think you have to answer that question. I think it's an interesting legal question, but we're not presented with it here because the plaintiff has not alleged any basis for rebutting the presumption or for evading or avoiding the application of the presumption. This is clearly an eligibility rule. It's of the same mold as those that have been found to be presumed to be reasonable. And so we don't need to answer that question is my answer. There's a couple of points I'd like to raise, if I may, which may not be clear from the briefs and the record. One, and we did mention this in our brief, the appellants in effect manufactured two quotes out of Agnew. They dropped an introductory word from one quote at 13 and 15 of their brief. They dropped when and added if. They did so outside the quotation marks, but they did change the meaning. And in their reply brief, which we did not get to respond to, at page 5, they dropped a but from the beginning of the sentence and began their quote with the word if. And so all I know is that when I learned to read sentences, if one begins with the word but and then goes to if, that means you better darn well look at the sentence that came before it. And the text, and as Judge Fahm said in Agnew, the context are particularly important here. And so they attempt to construct a test that is not a test, that what they want to say is that the burden is reversed and on the NCAA to prove every rule in its book is necessary and that the intercollegiate sports will die unless that rule is maintained. That is not what the text or the context of Agnew or any of the other cases say. So the text is important. Another thing that is maybe not quite obvious is that they argue that Mr. Deppie would have lost a year of eligibility. The rules are that everybody gets five years of eligibility and can play four years during that five-year window. So they already, everybody has one year to burn in any event. Many people use it for what's called redshirting. And Mr. Deppie had already redshirted his first year and didn't play, although he was on the team. So he had no more years to burn, and it is true that the transfer rule would have cost him a second year of eligibility, but in most cases that is not the case. Many people transfer, sit out a year, and use their redshirt year for that. So the rule does not have the effect that they say. Another argument that they make that I think is inappropriate on this record is they say, but for the rule, there would be, quote-unquote, thousands more scholarships available. That's not accurate. The other count of their complaint attacked and criticized the cap on the number of scholarships, but they dropped that, and it's now been dismissed with prejudice. It's not before this court. So the limit on the number of scholarships of 85 per team is not before the court, and they can't argue its absence as part of this record. So the number of scholarships on this record is given. The number of positions on a team is given. There's no way that more could be created by the absence of this rule. Now it is true that if this rule didn't exist, people might move around more. We don't know for sure, but they do allege that there would be greater mobility, and that's why we raise the specter of a free market or a free agency market. The NCAA and its members can reasonably want to limit that in sports that already have a fair degree of commercialization risk associated with them. It wants these intercollegiate games to be played in an educational context, by students, against students, and it can legitimately and rationally want to prohibit the creation of free agency where games are played under the college banner by free agents against free agents. Council essentially concedes this when they say that we could legitimately prohibit some of these interrupt school transfers by some less restrictive rule. That's enough right there to say that the rule has some rational basis, and then the ample latitude called for by the Supreme Court says that the NCAA gets to do that. They suggest that Mr. Deppie somehow lost a scholarship because of this rule. Again, that is not accurate. Mr. Deppie never had a scholarship at any of his schools that he attended, was never offered one by Iowa or anyone else, and at page 21 of the transcript in the district court, Judge Pratt asked council that question and they conceded that that was the case. And finally, I know I'm out of time, at page 15 of their reply brief, they say that he's quote-unquote a current student. They never allege that. They were given leave to amend by the district judge they could have alleged that, and it would have solved their standing problems perhaps, but they chose not to avail themselves of that opportunity. So on this record, we don't know what his status was when he filed the lawsuit. Thank you very much. Thank you. Ms. Fagan. Four minutes left. We've got four minutes left. I just have a couple quick points. First, in Board of Regents, the Supreme Court did not obviate the need for a rule of reason analysis of the NCAA's bylaws. Rather, the Supreme Court only held that while horizontal restraints would normally be held per se illegal, it was not going to apply a per se illegality presumption to the NCAA's bylaws because some manner of agreement was necessary in a sports league. Therefore, this idea that under the rule of reason we should not get to all the prongs should not be applied here when we're talking about three elements that the court should go through. Well, but the later steps in the analysis do not kick in unless there's an establishment of anti-competitiveness, and you can't get over that unless you, or get to that point, unless you establish or overcome the presumption of pro-competitiveness for an eligibility rule. And here, the district court did not even consider our allegations that we believe would get us through that bar. The district court only looked at the fact that this rule was listed under a heading entitled eligibility. I'm talking about what it is in fact, not what it's called. It's clearly an eligibility rule. You've conceded that from this podium. So it's got the pro-competitive presumption, and unless you've got something to overcome that presumption, then you don't get to the later steps of the rule of reason analysis. The next step in the rule of reason analysis... You don't get to that unless you establish you have something that overcomes the presumption here. This rule is presumed to be pro-competitive. You have to prove it or establish, point to allegations in your complaint that establish, if true, that it's not an eligibility rule. Actually, if we could back up, Your Honor. In a rule of reason analysis, I believe... I'm talking about this presumption of pro-competitiveness. You don't get to the later steps of rule of reason until you overcome that. The presumption of pro-competitiveness, to the extent that it's been discussed in Board of Regents and AGNU, was this idea that, in the twinkling of an eye, we could get rid of certain bylaws that, on their face, establish what it means to be an amateur or to be a student. Right, and those include eligibility rules. This particular eligibility rule, if we're going to call it an eligibility rule, does not establish what it means to be a student, and it does not establish what it means to be an amateur. It does not speak to those rules that the NFL outlined... I'm sorry, that the Supreme Court outlined in Board of Regents as to the rules that would establish whether someone is a student or whether someone is an amateur. Those rules are those that are fundamental, that we would all agree, for example... Amateurs can't be traded. Teams can't poach for amateurs. That's the idea behind this rule. It's an anti-poaching, anti-free agency rule. Free agency is what characterizes, in part, a professional league. And the NCAA's lawyer conceded up here today that one of those rules has already been relaxed, the one that came up in... whether it was a graduate student versus playing for an undergraduate team, etc. That doesn't make any difference here. I think it does, Your Honor, in the sense that a very broad good intention does not mean that all laws or all bylaws regarding a particular issue should be given a free pass. And that's what Board of Regents and the Supreme Court said in footnote 23. And I would also just respond to a point that was asked earlier about whether the Seventh Circuit is an outlier. The Third Circuit, actually, and Smith did not... I see my time is up. I would just say that the Third Circuit never got to the issue that we're speaking of today. The Third Circuit only spoke of whether the NCAA rules implicated commercial transactions, which it held it didn't, which is the opposite here, but two, that it would have applied a rule of reason analysis had it gotten there. Thank you. All right, thank you. Our thanks to all counsel. The case is taken under advisement.